UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEANDRE KEITH WILLIAMS,

        Plaintiff,

v.

MATTHEW FAIR and HUSSEIN
ABDALLAH,

        Defendants.

_____/

Case No. 2:24-cv-10495
Hon. Gershwin A. Drain

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS [#6]

### I.      INTRODUCTION

This case arises out of Plaintiff Deandre Keith Williams' traffic stop and arrest on July 20, 2022, in Southfield, Michigan. ECF No. 1, PageID.1. Plaintiff brings a cause of action under 42 U.S.C. § 1983, alleging that Defendant Officers Matthew Fair and Hussein Abdallah subjected him to an unlawful arrest and excessive force during his arrest. *Id.* at PageID.1–3. Presently before the Court is the Defendant Officers Matthew Fair and Hussein Abdallah's Motion to Dismiss, which they filed in lieu of an answer to Plaintiff Deandre Keith Williams' Complaint. ECF No. 6. Defendants argue that Plaintiff's pleadings fail to state a claim for either an unlawful arrest or excessive force, and that they are entitled to qualified immunity. *Id.* The

1

Motion has been fully briefed. *Id.*; ECF No. 7; ECF No. 8. The Court concludes that oral argument will not aid in the disposition of this Motion and, accordingly, will determine the outcome on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2). For the following reasons, the Court GRANTS Defendants' Motion to Dismiss.

## II.     BACKGROUND

### A. Facts According to the Complaint

According to the Complaint, on July 20, 2022, Defendants—both police officers for the City of Southfield—stopped Plaintiff's vehicle for committing traffic violations. ECF No. 1, PageID.3. Upon discovering that Plaintiff's driver's license was suspended, Defendants called for backup. *Id.* Defendant Matthew Fair returned to Williams' vehicle on the driver's side and ordered him out of the vehicle. *Id.* Plaintiff did not obey the command and kept his hands on the steering wheel. *Id.* He claims that during this encounter he did not pose a threat, engage in criminal activity, or possess a weapon or drugs. *Id.* Despite this, Defendants tased Plaintiff "at least three times," and then pulled him out of the vehicle to arrest him. *Id.* Plaintiff alleges that "[a]t least two officers were at the driver's side door" and could have removed him without deploying tasers because Plaintiff has a "small stature." *Id.* at PageID.4. After being tased, Plaintiff had to "seek medical attention." *Id.* Plaintiff states that police body camera footage corroborates his version of events. *Id.*

2

### B. The Lawsuit

As a result, Plaintiff brings a claim under 42 U.S.C. § 1983 for excessive force under the Fourth Amendment, alleging that Defendants' taser use constituted excessive force. *Id.* at PageID.5. In addition, on the first page of Plaintiff's Complaint, he claims that the arrest itself was unlawful. *Id.* at PageID.1. However, Plaintiff does not include unlawful arrest as a separate count in the Complaint, *see id.* at PageID.3–5, nor does he address this claim elsewhere in the Complaint.[1]

In lieu of answering the Complaint, Defendants filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). First, Defendants argue that under the facts pled, Plaintiff's arrest was lawful because (1) he states that he was pulled over for traffic violations, and (2) he admits that he was driving on a suspended license, which is a misdemeanor crime. ECF No. 6, PageID.29–30. Second, Defendants argue that Plaintiff's allegations regarding the force utilized during his arrest do not permit a plausible inference that the force was excessive, because he admits he disobeyed Defendants' orders to step out of the vehicle and provided no other information to contextualize whether the use of the tasers was warranted. *Id.* at PageID.30–31. Furthermore, Defendants state that video footage of Plaintiff's

---

[1] The Court doubts that Plaintiff intended to bring a claim for unlawful arrest; the language appears to be the result of inartful complaint drafting. However, Defendants address the claim in their Motion to Dismiss, and for thoroughness, the Court will briefly address it as well.

arrest demonstrates that Plaintiff "initially fled from officers travelling at excessive speeds"; that once Plaintiff was stopped, officers "physically struggled to remove [Plaintiff from the vehicle] before he was tased"; and that Plaintiff "placed the car in drive and it lurched forward" while the struggle to remove Plaintiff was ongoing. *Id.* at PageID.22.

In Plaintiff's response, he provides additional facts not contained in his Complaint. Plaintiff states that he never threatened Defendants and never attempted to flee. ECF No. 7, PageID.39. Rather, he engaged in "passive resistance" to Defendants' commands, which is insufficient to legitimize the use of a taser. *Id.* (citing *Eldridge v. City of Warren*, 533 Fed. App'x 529 (6th Cir. 2013)). Plaintiff maintains that he was tased multiple times while "trapped by his seatbelt," so that he was unable to comply with officers' orders to exit the vehicle. *Id.* at PageID.40. Plaintiff concludes that because of his passive resistance, lack of flight or physical opposition, and the fact that he posed no risk to law enforcement, the use of tasers against him was excessive and this is clearly established in the law. *Id.* at PageID.42, 44. Plaintiff included a screenshot from Defendant Fair's body camera that shows him being tased. *Id.* at PageID.46.

Defendants' reply states that Plaintiff's response "does not address or even acknowledge" the deficiencies in his pleading, and instead argues new facts that were not pled. ECF No. 8, PageID.48. Defendants also note that the video footage

of the arrest contradicts Plaintiff's claims. Defendants provided screenshots showing that Plaintiff was unbuckled and his hands were not on the steering wheel when officers were attempting to remove him from the vehicle. Thus, Defendants argue that even if the Court was amenable to allowing Plaintiff to amend his Complaint to fix his pleading deficiencies, such amendments would be futile. ECF No. 8, PageID.51.

Because of the parties' competing accounts of what the video footage showed, the Court ordered Defendants to upload the footage so that the Court could consider it. ECF No. 9. Defendants uploaded the footage, which includes Defendant Fair's body camera footage, Defendant Abdallah's body camera footage, and the police cruiser's dash camera footage. ECF No. 10.

### C. Facts According to the Video Footage

The video footage paints a different picture of what occurred on July 20, 2022. The dash camera footage shows Defendants pursuing Plaintiff with their sirens on while Plaintiff speeds away, runs a red light, and weaves through traffic before ultimately coming to a stop at a light behind halted traffic. Dash Cam, 00:45–01:13. Defendant Fair orders Plaintiff to shut off his car and to roll down all the windows. Fair Body Cam, 01:14–01:20. Defendant Fair approaches Plaintiff's side of the vehicle and asks for Plaintiff's license and insurance. *Id.* at 01:50–03:24. Meanwhile, Defendant Abdallah approaches the passenger side of the vehicle,

asking for the backseat passenger's ID and demanding he keep his hands on the headrest. Abdallah Body Cam, 01:55–03:27. Defendants then return to their police vehicle for a few moments until two additional officers arrive at the scene (referred to hereinafter as the backup officers). *Id.* at 03:28–04:30; Fair Body Cam, 03:25–04:27.

Defendant Fair returns to Plaintiff's side of the vehicle, opens his door, and says "go ahead and step out." Fair Body Cam, 04:36–04:38. Plaintiff does not immediately comply; rather, he puts on one of his shoes and looks at his phone. *Id.* at 04:38–04:45. Defendant Fair orders him out one more time during this initial exchange. *Id.* at 04:43–04:44. When Plaintiff continues to disobey Defendant Fair's commands, Defendant Fair grabs Plaintiff by the arm and Plaintiff grips the steering wheel, resisting being pulled out of the car. *Id.* at 04:49–04:50. One of the backup officers on Plaintiff's side of the vehicle joins in attempting to remove Plaintiff. Defendant Fair's body camera shows Plaintiff leaning into the vehicle resisting the officers as a struggle ensues. *Id.* at 04:51–04:53. The other backup officer, who was initially on the passenger side of the vehicle, runs over to Plaintiff's side and begins pulling out his taser. Dash Cam, 05:18–05:20. Thus, Defendant Fair and both backup officers are on Plaintiff's side of the vehicle.

During this time, Defendant Abdallah is on the passenger side of the vehicle, where he remains throughout the entire ordeal. *See* Abdallah Body Cam, 04:42.

6

When Defendant Abdallah notices a struggle is occurring on the other side of the car, he opens the front passenger's side door. From Defendant Abdallah's body camera perspective, we see what Plaintiff is doing while leaning into the vehicle: Plaintiff appears to be reaching for the keys in his ignition. An officer's arm is grabbing his, attempting to prevent this from occurring. *See id.* at 04:51.

Around this time, on Plaintiff's side of the vehicle, an officer can be heard yelling "Taser! Taser! Taser!" before both Defendant Fair and one of the backup officers appear to deploy their tasers nearly simultaneously. Fair Body Cam, 04:52–04:57. Amidst the tasing, Plaintiff manages to turn his car on with the brakes applied. Dash Cam, 05:23–05:24. From the perspective of Defendant Abdallah's body camera at this same time, we see Plaintiff's hand on the gear stick of his vehicle. Abdallah Body Cam, 04:55–04:56. Plaintiff then shifts the car into drive. *Id.* An officer begins shouting "He's driving! He's driving! He's driving!" *Id.* at 04:56–04:57; Fair Body Cam, 04:56–04:57. From the dash camera, we see the car lurch forward. Dash Cam, 05:26–05:29.

The officers step back from the moving vehicle, but it appears the tasers begin working, as Plaintiff's body stiffens and the car stops. Fair Body Cam, 05:03–05:06; Dash Cam, 05:29.[2] The officers close in on Plaintiff again and can be heard

---

[2] Later in Defendant Abdallah's body camera footage, Defendant Abdallah explains to another officer that he is the one who shifted the car back into park. Abdallah

demanding Plaintiff get out of the car while he is being tased. Fair Body Cam, 05:03–05:09. The other backup officer deploys his taser around this time. *Id.* at 05:08–05:09. Plaintiff begins yelling "Okay! Okay!" while presenting the officers with his hands, and the officers physically remove him from the vehicle. *Id.* at 05:09–05:16.

## III.   LEGAL STANDARDS

### A. Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff's complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While this standard does not require "detailed factual allegations," a plaintiff's pleadings must raise "more than labels and conclusions." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In other words, the factual allegations must "raise a right to relief above the speculative level," and must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A motion to dismiss for failure to state a claim, brought under Federal Rule of Civil Procedure 12(b)(6), tests the sufficiency of the pleadings by asking whether the complaint satisfies these requirements and states a claim upon which relief may be

---

Body Cam, 09:33–09:38. Defendant Abdallah's body camera is facing down during the actual struggle with Plaintiff, so these actions cannot be seen.

granted. *See Bassett v. Nat'l College Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

Generally, in reviewing a motion to dismiss under Rule 12(b)(6), a court "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] its allegations as true, and draw[s] all reasonable inferences in favor of the plaintiff." *Id.* at 430 (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)) (alterations added). But in cases where defendants raise the defense of qualified immunity, the Sixth Circuit permits courts to consider videos of the events at issue— to the extent they contradict the complaint—at the motion to dismiss stage. *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022); *Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017). This is because "[q]ualified immunity isn't just a defense to liability—it's immunity from the costs and burdens of suit in the first place." *Bell*, 37 F.4th at 364. Thus, "when uncontroverted video evidence easily resolves a case, [courts] honor qualified immunity's principles by considering the videos." *Id.*

However, at the motion to dismiss stage, courts can "only rely on the videos over the complaint to the degree the videos are clear and blatantly contradict or utterly discredit the plaintiff's version of events." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380)) (internal quotation marks and brackets omitted). Otherwise, courts

must treat the allegations in the complaint as true, as they typically do for a motion to dismiss in a normal case. *Id.*

## B. Qualified Immunity Standard

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted). In so doing, qualified immunity balances two competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* When a defendant raises the qualified immunity defense, "the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007) (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)).

There is a two-tiered inquiry to determine whether a defendant is entitled to qualified immunity. *Shumate v. City of Adrian*, 44 F.4th 427, 439 (6th Cir. 2022). At step one, a court determines "whether the facts make out a violation of a constitutional right." *Id.* (citing *Pearson*, 555 U.S. at 232). At step two, a court determines whether "the constitutional right was clearly established at the time of

10

the alleged violation." *Id.* (citing *Wright v. City of Euclid*, 962 F.3d 852, 864 (6th Cir. 2020)). If either inquiry is resolved in the negative, the defendant is entitled to qualified immunity. *Id.* Notably, a court may begin its analysis with either prong and may resolve the case on either prong. *Bell*, 37 F.4th at 367.

## IV.   ANALYSIS

### A. Unlawful Arrest

The first issue is whether Plaintiff states a claim for unlawful arrest. Plaintiff mentions that his arrest was unlawful only once in his Complaint, without providing for it in a separate count in his Complaint or ever mentioning it again in his Complaint or in his response briefing. ECF No. 1, PageID.1; ECF No. 7. Regardless, Defendants addressed the claim in their Motion to Dismiss. They argue that neither the traffic stop nor the arrest were unreasonable under the circumstances, because Defendants had probable cause to believe Plaintiff committed a traffic violation and probable cause to believe that Plaintiff committed a crime in their presence. ECF No. 6, PageID.29–30. Thus, the traffic stop and arrest were lawful.

The Fourth Amendment guarantees the right of people to be secure in their persons against unreasonable searches and seizures. U.S. Const. amend. IV. Temporary detentions of individuals during a traffic stop are seizures, so these must be reasonable under the circumstances. *Wren v. United States*, 517 U.S. 806, 809–10 (1996). A decision to conduct a traffic stop is reasonable where the officer has

11

probable cause to believe that a traffic violation has occurred. *Id.* at 810. Similarly, arrests of individuals are seizures, so these must also be reasonable. *District of Columbia v. Wesby*, 583 U.S. 48, 56 (2018). Just as with traffic stops, an arrest is reasonable if the officer has probable cause to believe that the suspect has committed a crime in the officer's presence. *Id.*

Here, Plaintiff has pled no facts to suggest that officers did not have probable cause to either stop his vehicle or arrest him. Plaintiff's Complaint states that he was pulled over "for committing traffic violations." ECF No. 1, PageID.3. He does not deny that he committed traffic violations. Indeed, the dash camera footage shows that he fled from officers at high rates of speed, wove around traffic, and ran a red light. Dash Cam, 00:45–01:13. Further, Plaintiff's Complaint admits that he was driving with a suspended license. ECF No. 1, PageID.3. Driving with a suspended license is a misdemeanor crime that can result in a fine, imprisonment, or both. MICH. COMP. LAWS § 257.904. Plaintiff was driving when Defendants encountered him, so Defendants had probable cause to believe Plaintiff committed a crime in their presence.

Therefore, to the extent Plaintiff raises an unlawful arrest claim, it must fail.

### B. Excessive Force

The next issue is whether Plaintiff states a claim for excessive force under the Fourth Amendment. Defendants argue that Plaintiff's bare allegation in his

Complaint that the use of tasers was excessive, without more, is insufficient to infer that it was excessive when Plaintiff admitted that he ignored officers' commands to step out of his vehicle and instead held onto the steering wheel. ECF No. 6, PageID.31. Plaintiff responds by providing more context: he was only passively—not actively—resisting officers, he was unable to comply with officers because he was trapped by his seatbelt while being tased, and he was subdued when officers continued to tase him. ECF No. 7. He claims that under these circumstances, the force used was excessive. Further, he maintains that this is clearly established under the law, citing *Eldridge*, 533 Fed. App'x at 529; *Goodwin v. City of Painesville*, 781 F.3d 384 (6th Cir. 2015); *Caie v. West Bloomfield Twp.*, 485 Fed. App'x 92 (6th Cir. 2012); and *Kent v. Oakland Cnty.*, 810 F.3d 384 (6th Cir. 2016). In reply, Defendants claim that video footage of the encounter contradicts Plaintiff's version of events. ECF No. 8.

### a.  *Prong One of the Qualified Immunity Analysis: Whether Plaintiff's Constitutional Rights Were Violated*

To determine whether an officer's use of force while effecting an arrest is excessive in violation of the Fourth Amendment, a court must consider whether the officer's actions are objectively reasonable in light of the circumstances confronting him, without regard to his underlying intent or motivation. *Goodwin*, 781 F.3d at 321 (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Reasonableness must be judged from "the perspective of a reasonable officer on the scene," not with "the

13

20/20 vision of hindsight." *Graham*, 490 U.S. at 396. In other words, courts must account for the fact that "officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Caie*, 485 Fed. App'x at 95 (quoting *Graham*, 490 U.S. at 397).

The test for the reasonableness of the use of force "is not capable of precise definition or mechanical application." *Graham*, 490 U.S. at 396. *Graham* directs courts to pay "careful attention to the facts and circumstances of each particular case, including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (numbering added). Deciding reasonableness requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake. *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

i.  <u>Active Resistance</u>

The parties expend most of their effort arguing *Graham*'s third factor: whether Plaintiff was actively resisting arrest or trying to flee. As such, the Court will address this factor first. As to the use of tasers specifically, Sixth Circuit cases "firmly establish that it is *not* excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest." *Rudlaff v. Gillispie*, 791 F.3d

638, 641 (6th Cir. 2015) (citing *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012)) (emphasis in original). Active resistance involves "some outward manifestation—either verbal or physical—on the part of the suspect" that "suggest[s] volitional and conscious defiance[.]" *Eldridge*, 533 Fed. App'x at 534. Examples of active resistance include "physical struggles with police, threats toward officers, refusal or resistance to being handcuffed, and erratic or irrational behavior." *Browning v. Edmonson Cnty.*, 18 F.4th 516, 527 (6th Cir. 2021); *see also Rudlaff*, 791 F.3d at 643 (finding that a person who resists lawful arrest "and refuses to move his hands so the police can handcuff him" may reasonably be tased); *Kent*, 810 F.3d at 392 (collecting cases and noting that active resistance includes physically struggling with and disobeying officers, refusing to move one's hands so that they may be handcuffed, and fleeing from police).

In contrast, mere noncompliance, standing alone—with no outward manifestations suggesting volitional or conscious defiance—does not constitute active resistance. *Shumate*, 44 F.4th at 446; *Eldridge*, 533 Fed. App'x at 534. "Even repeated refusals to comply will not, by themselves, convert passive into active resistance." *Alston v. City of Detroit Police Officers*, 717 F. Supp. 3d 618, 631 (E.D. Mich. 2024) (citing *Eldridge*, 533 Fed. App'x at 535). As such, the Sixth Circuit has found that the use of tasers against passively resisting suspects who simply did not follow police commands constituted excessive force. *See Eldridge*, 533 Fed. App'x

15

at 535 (finding excessive force where police used taser on a suspect who was having a hypoglycemic episode and not following police orders to step out of the vehicle); *Browning*, 18 F.4th at 529 (finding excessive force where police used taser on a suspect who had just been in a severe car accident and was not responding to the officer's demand to show his hands). Furthermore, a suspect has a right not to be tased, even if he was once resisting, once he is subdued. *Kent*, 810 F.3d at 396; *Thomas v. Plummer*, 489 Fed. App'x 116, 126 (6th Cir. 2012) (finding officer's tasing of suspect excessive force where suspect was no longer resisting but had dropped to her knees and raised her hands over her head).

Here, Plaintiff's Complaint states that Defendant Fair ordered Plaintiff out of the vehicle and that "Plaintiff Williams did not obey his command and instead held on to his steering wheel." ECF No. 1, PageID.3. Thereafter, "Defendants tased Plaintiff Williams at least three times" before pulling him out of the vehicle. *Id.* The Complaint states that Plaintiff did not "pose a threat, engage in criminal activity, [or] possess a weapon or drugs." *Id.* at PageID.5. Plaintiff also alleges that he has a "small stature," and that Defendants could have removed him without the use of weapons. *Id.* at PageID.4. The Court will assume without deciding that Plaintiff's Complaint, considered alone, states a claim for excessive force because it describes Plaintiff— a nonthreatening suspect of a nonviolent crime—merely ignoring Defendants' commands without any physical or verbal struggle whatsoever. Under Sixth Circuit

16

precedent, "failure to exit a vehicle is not active resistance and does not justify the use of a taser." *Browning*, 18 F.4th at 527.

However, the video footage of the incident is determinative. Rather than showing passive resistance, the footage demonstrates that officers wrestled with Plaintiff, attempting to pull him out of the vehicle, while Plaintiff repeatedly yanked his arms away, physically resisted, leaned into the vehicle, and eventually turned the vehicle back on. Fair Body Cam, 04:43–04:53. Refusing to present one's hands to be handcuffed constitutes active resistance. *See Hagans*, F.3d at 509. Locking up one's body to prevent officers from effecting an arrest constitutes active resistance. *See Rudlaff*, 791 F.3d at 642. Attempting to flee constitutes active resistance. *See Kent*, 810 F.3d at 392. Contrary to Plaintiff's assertions that he never attempted to flee, never physically resisted, and merely placed his hands on the steering wheel throughout the ordeal, ECF No. 7, PageID.39–40, video footage conclusively demonstrates that Plaintiff engaged in multiple acts of resistance and clearly exhibited "outward manifestation[s]… [that] suggested *volitional* and *conscious*

defiance" to Defendants' orders.[3] *Eldridge*, 533 Fed. App'x at 534 (emphasis added). Thus, officers were entitled in that moment to use a taser to subdue Plaintiff.[4]

Nor was the amount of tasing excessive here. As the Sixth Circuit noted in *Rudlaff*, it is not excessive force for an officer to tase someone, even "multiple times," if that person is actively resisting arrest. *Rudlaff*, 791 F.3d at 641; *see also Hagans*, 695 F.3d at 509 (finding there was no clearly established right not to be tased multiple times when actively resisting arrest); *Williams v. Sandel*, 433 Fed. App'x 353, 362 (6th Cir. 2011) (finding 37 taser activations, and the use of batons and pepper spray, reasonable where suspect was unsecured and unwilling to comply with officers' attempts to restrain him).

Here, video footage shows that Defendant Fair deployed his taser when Plaintiff was actively resisting commands to get out of the vehicle; indeed, when Plaintiff was reaching for his keys to turn his car back on. Fair Body Cam, 04:55.

---

[3] Plaintiff's argument that he did not "resist arrest" under Mich. Comp. Laws § 750.81d(1)—Michigan's resisting/obstructing statute—is inapposite here. ECF No. 7, PageID.39. Plaintiff has cited no case law to suggest that one's conduct must fall under the definition of "resisting" in a state resisting/obstructing statute to find that the use of force was reasonable where one resisted arrest. Furthermore, the term "resist" in the statute means "to withstand, strive against, or oppose" in a physical manner. *People v. Morris*, 314 Mich. App. 399, 408–10 (2016). Plaintiff's conduct, as demonstrated by the video footage, falls into this definition.

[4] Plaintiff's claim that he was unable to comply with officers' commands because he was "trapped by his seatbelt" is clearly belied by the video footage, which shows he was never buckled during the incident. *See* Fair Body Cam, 04:47 (showing seatbelt unbuckled on the bottom right of video).

Defendant Fair deployed his taser simultaneously or just slightly after one of the backup officers deployed his. *Id.* After the officers' tasers made contact with Plaintiff, Plaintiff still resisted for several moments—refusing to give up his hands, turning on his car, and even shifting it into drive. *Id.* at 04:53–05:00. Considering that attempting to flee, locking up one's body, and refusing to give one's hands to be handcuffed constitute "active resistance," Defendant Fair's tasing of Plaintiff— just seconds after one of the backup officers tased Plaintiff and before Plaintiff stopped resisting—does not constitute excessive force. *See Kent*, 810 F.3d at 392; *Rudlaff*, 791 F.3d at 642; *Browning*, 18 F.4th at 527.

As for Defendant Abdallah, it does not appear that he ever deployed his taser. It was never in view, and Defendant Abdallah mostly preoccupied himself with restraining the other passengers of the vehicle rather than assisting to restrain Plaintiff. Abdallah Body Cam, 04:50–05:04. Indeed, later in his body camera footage, Abdallah explained to another officer that during the skirmish, when the other officers deployed their tasers on Plaintiff, he was the one who put Plaintiff's car back into park and turned it off again. *Id.* at 09:33–09:40. However, at the motion to dismiss stage, the Court may only credit the police video to the extent that it is clear and blatantly contradicts Plaintiff's version of events. *Bell*, 37 F.4th at 364. Because there are several seconds where Defendant Abdallah's body camera is

facing downward and we are not able to see what he is doing, the Court must accept Plaintiff's version of events—that Defendant Abdallah tased Plaintiff—as true. *Id.*

Nevertheless, assuming that Defendant Abdallah *did* deploy his taser during the several seconds that his body camera was facing downward, such tasing would not have been excessive force. *See* Abdallah Body Cam, 04:52–04:55; 04:57–05:03. Defendant Abdallah's body camera was facing downward when Plaintiff was actively resisting; indeed, right before and right after Plaintiff turned on his car and shifted it into drive. *Id.* Considering that Plaintiff was actively trying to drive his car away, which could have potentially harmed all the officers (who were surrounding the moving vehicle) and endangered others on the road, Defendant Abdallah (like Defendant Fair) would have been within reason to deploy his taser to prevent this from happening. *Rudlaff*, 791 F.3d at 642; *Williams*, 433 Fed. App'x at 363. By the time Defendant Abdallah's body camera is facing forward again, he begins removing the front passenger from the vehicle at just about the same point that Plaintiff finally begins to become subdued by the other officers' tasers. Abdallah Body Cam, 05:01–05:08. Thus, it is not possible that any deployment of Defendant Abdallah's taser was unreasonable.[5]

---

[5] The Court expresses no opinion about the backup officers' use of tasers because they are not parties to this lawsuit.

20

<u>ii. Severity of the Crime and Threat to Safety</u>

Finally, the Court briefly addresses *Graham*'s other two factors: the severity of the crime at issue and whether Plaintiff posed an immediate threat to the safety of officers and others. *Graham*, 490 U.S. at 396. Plaintiff points out that the law Plaintiff violated—driving on a suspended license—is only a misdemeanor and does not typically result in arrest. ECF No. 7, PageID.39. Plaintiff also claims he was of no immediate threat to officers. *Id.* at PageID.44.

It is true that driving on a suspended license is not a severe or dangerous crime. *See Brown v. Ahmed*, No. 23-10415, 2024 WL 4354850, at *5 (E.D. Mich. Sept. 30, 2024). But the Court must still consider the other *Graham* factors. *Id.*; *Estate of Collins v. Wilburn*, 755 Fed. App'x 550, 555 (6th Cir. 2018). In this case, Plaintiff's active resistance strongly favored the use of tasers. Furthermore, although Plaintiff claims he did not pose a threat to officers or others, the Sixth Circuit and others have "recognized the danger posed by proximity to a busy roadway in finding the use of force against a non-compliant individual objectively reasonable." *Williams*, 433 Fed. App'x at 363. Here, considering Plaintiff tried to drive away with officers surrounding his vehicle on a busy road, Plaintiff did pose a threat to officers and others.

In sum, considering all the *Graham* factors, Plaintiff fails to state a claim that Defendants subjected him to excessive force.

### b.  *Prong Two of the Qualified Immunity Analysis: Whether the Right Was Clearly Established*

Because the Court found that Plaintiff's constitutional rights were not violated, prong two of the qualified immunity analysis is unnecessary. However, even assuming that Plaintiff did make out a violation of his constitutional rights, he failed to demonstrate that this right was clearly established.

An officer violates clearly established law when, "at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood what he is doing violates that right." *Kent*, 810 F.3d at 395 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)) (cleaned up). A plaintiff bears the burden of showing that a right is clearly established, which requires the plaintiff to "point to a case showing that reasonable officers would have known their actions were unconstitutional under the specific circumstances they encountered." *Bell*, 37 F.4th at 367 (citing *Cunningham v. Shelby Cnty.*, 994 F.3d 761, 765 (6th Cir. 2021)). There need not be a case directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. Notably, a plaintiff "cannot point to unpublished opinions to meet this burden." *Bell*, 37 F.4th at 368.

Plaintiff cites *Caie v. West Bloomfield Twp.*, *Goodwin v. City of Painesville*, *Kent v. Oakland Cnty.*, and *Eldridge v. City of Warren* as establishing that the force

22

Plaintiff was subjected to was "excessive." But none of these cases establish this fact.

First, *Caie* and *Eldridge* are unpublished cases. *Caie*, 485 Fed. App'x at 92; *Eldridge*, 533 Fed. App'x at 529. As the Sixth Circuit made clear in *Bell*, Plaintiff cannot point to unpublished decisions to meet the burden of demonstrating a right is clearly established. *Bell*, 37 F.4th at 368 ("[H]ow can an unpublished case place a question beyond debate when it doesn't even bind a future panel of this court?"). Thus, neither of these cases clearly establish Plaintiff's right, and the Court looks instead to the two published cases Plaintiff cites.

In *Goodwin*, officers were called to the plaintiff's residence for a domestic dispute that occurred at a party at the plaintiff's residence. *Goodwin*, 781 F.3d at 318. Officers intended to arrest the plaintiff for disorderly conduct, based on allegations by one of the partygoers. *Id.* at 319. Officers asked the plaintiff to step outside of his apartment, but he refused. *Id.* Almost immediately, officers entered the plaintiff's apartment and began tasing him. *Id.* Officers repeatedly tased the plaintiff for 26 seconds even while he was convulsing. *Id.* The plaintiff was unresponsive, foaming at the mouth, and went into cardiac arrest. The lack of oxygen to his brain caused by the tasing and cardiac arrest resulted in severe permanent cognitive impairment. *Id.* at 320. The Sixth Circuit held that the plaintiff had not resisted arrest by merely refusing to exit his own home, which is subject to

heightened Fourth Amendment protections—particularly where he had not been told he was being detained. *Id.* at 326. Furthermore, the Sixth Circuit concluded that the subsequent tasing he received after he began convulsing on the floor was gratuitous. *Id.* at 326–28.

In *Kent*, the plaintiff got into a verbal altercation with EMTs who were attempting to resuscitate his dying father in the plaintiff's home. *Kent*, 810 F.3d at 387–88. When officers arrived on the scene, they ordered the plaintiff to calm down and threatened him with tasing. *Id.* at 388. The plaintiff raised his hands with his back against the wall and said, "Go ahead and Taze me, then." *Id.* Officers obliged, and tased him. The Sixth Circuit noted that the plaintiff was not aware he was being detained, which favors a finding of excessive force. *Id.* at 391. In addition, the court stated that by raising his hands with his back against the wall, Plaintiff was indicating submission; he was not resisting arrest, because all he had done was display some verbal hostility and anger at the time of the encounter with police. *Id.* at 392–93. Finally, the court observed that the plaintiff was in his home, the "most sacred of spaces" under the Fourth Amendment. *Id.* In conclusion, the Sixth Circuit determined that the tasing was objectively unreasonable. *Id.*

One analogous feature between these cases and Plaintiff's case is that Defendants never explicitly told Plaintiff that he was indeed being arrested before

they began ordering him out of the vehicle. However, this is only one "consideration in the totality-of-the-circumstances analysis." *Kent*, 810 F.3d at 391.

In contrast, there are numerous distinguishing features between these cases and Plaintiff's case. For one, Plaintiff was not in his home—a sacred space under the Fourth Amendment—but in his car. *See Cady v. Dombrowski*, 413 U.S. 433, 439–40 (1973) (stating that there "is a constitutional difference between houses and cars" and noting that cars are subject to less Fourth Amendment protection). And Plaintiff did more than passively resist arrest or engage in verbal altercations with police like the plaintiffs in *Goodwin* and *Kent*; rather, he physically struggled with officers while he managed to turn his vehicle back on and shift it into drive. Furthermore, Defendants deployed their tasers while Plaintiff was leaning into his car, refusing to be handcuffed, yanking his arms away, and actively trying to turn his car on and flee. With such major distinctions, it cannot be said that based on these cases Plaintiff's "constitutional question [is] beyond debate." *al-Kidd*, 563 U.S. at 741.

Therefore, even if Plaintiff established that his right against excessive force was violated, Plaintiff failed to demonstrate that this right—under these circumstances—was clearly established.[6]

---

[6]     The Court notes briefly that in the caption of his complaint, Plaintiff also states that Defendants Fair and Abdallah are sued in their official capacities. *See* ECF No. 1, PageID.1. An official capacity claim is treated legally as a suit against the

## V.     CONCLUSION

Accordingly, for the reasons described above, Defendants' Motion to Dismiss

[#6] is **GRANTED.**

**SO ORDERED.**

Dated:  December 6, 2024                     /s/Gershwin A. Drain
                                              GERSHWIN A. DRAIN
                                              United States District Judge


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
December 6, 2024, by electronic and/or ordinary mail.
/s/ Marlena Williams
Case Manager

---

government entity. *Monell v. Dep't of Social Servs. of N.Y.C.*, 436 U.S. 658, 690 n.55 (1978). And in § 1983 actions, there is no *respondeat superior* liability. *Id.* at 691. Thus, for a plaintiff to prevail in a suit against officers in their official capacities, the plaintiff must show that the officer's execution of the government's "policy or custom" is what inflicted his injury, *id.* at 694, or that there is "an affirmative link" between the policy and the constitutional violation alleged. *City of Okla. v. Tuttle*, 471 U.S. 808, 823 (1985).

Here, Plaintiff pleaded absolutely no facts that could establish that any of the City of Southfield's policies or customs inflicted his injury, or that there is any link whatsoever between Southfield's policies and Defendants' actions in this case. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (providing ways in which a plaintiff may establish that a government's policy or custom led to his constitutional injury). Indeed, Defendants raised the sole defense of qualified immunity in their Motion to Dismiss—a defense that is unavailable in official capacity suits—and Plaintiff not once mentioned the inapplicability in his response brief. *See United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 483–84 (6th Cir. 2014). Regardless, any official capacity claim in this case would necessarily fail because no constitutional violation occurred. *See Cleary v. Cnty. of Macomb*, 409 Fed. App'x 890, 906 (6th Cir. 2011).

26